MURNAGHAN, Circuit Judge:
 

 Maryland Glass Corporation, on October 31,1979, filed a voluntary petition for reorganization under Chapter XI of the Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, 92 Stat. 2549,
 
 codified at
 
 11 U.S.C. § 101 et
 
 seq.
 
 It thereafter on April 23, 1981 voluntarily converted the case to a Chapter VII liquidation. In that intervening period, the debtor remained in possession, operating the business under the control of the Bankruptcy Court.
 

 Among the debtor’s assets was real estate in Baltimore City of substantial value on which the Maryland National Bank held a security interest in the nature of a mortgage under two Deeds of Trust dated October 20, 1978 and recorded on October 26, 1978. The principal amount of the indebtedness secured by the mortgage was $6,000,000. At the time of the voluntary petition, real estate taxes were in arrears for the year 1979-80. A lien for them under Article 81 § 70 of the Annotated Code of Maryland in the aggregate amount of $95,634.41 had attached on July 1, 1979.
 

 The real estate taxes on the property imposed by Baltimore City and the State of Maryland for the year 1980-81 totalled $75,200.59. The date of finality with respect to 1980 taxes was January 1, 1980, they became due and payable on July 1, 1980, and, not having been paid, they became overdue and in arrears on October 1, 1980. Md.Ann.Code art. 81 § 48(e).
 

 Additionally liens for water rents, sewer charges and fire protection service in the aggregate amounting to $86,914.88 also arose on July 1, 1980 against the real property.
 
 [1]
 

 An automatic stay precluding exercise by the Bank of its foreclosure rights under the deeds of trust had attached, under 11 U.S.C. § 362, at the time of the October 31, 1979 filing of the petition for reorganization. The Bank was initially unsuccessful in an effort to have the automatic stay lifted; a complaint seeking such relief was dismissed by the Bankruptcy Court on August 7,1980, after the 1980-81 real estate taxes had become due and payable. However, the Bankruptcy Court, acting on a Complaint to Modify Stay or Convert to Chapter 7 and a Stipulation thereon, on February 23, 1981, relieved the Bank, as mortgagee, of the consequences of the stay. A sale ensued on June 11, 1981, and was ratified on July 23, 1981 by the Circuit Court for Baltimore City. The sale produced $2,500,000.
 

 When the City of Baltimore asserted its right to be paid the 1980-81 real estate taxes and related water rents, sewer charges and fire protection fees, the trustee in bankruptcy initiated an adversary pro
 
 *1141
 
 ceeding. Consequently, pursuant to an order of the Bankruptcy Court to sell the mortgaged property free and clear of liens, with an escrow account to be established from a portion of the proceeds, there was a settlement of the sale on July 30, 1981. The City of Baltimore, in its own right and as collector for the State of Maryland, transferred its interests in the real property to the escrowed funds.
 

 As for the 1979-80 taxes, the Maryland National Bank has not contested their superiority but rather has paid those obligations inasmuch as the liens for accrued taxes admittedly antedated October 31, 1979. Section 545 of the Bankruptcy Code, 11 U.S.C.' § 545, permits the avoidance of a statutory lien “not perfected or enforceable on the date of the filing of the petition [in bankruptcy] ...” against a
 
 bona fide
 
 purchaser, hypothetical or real “that purchases the property on the date of the filing of the petition.... ” The district court, reversing an order of the bankruptcy judge, agreed with the argument of Maryland National Bank that the 1980-81 tax lien was not “perfected or enforceable” on October 31, 1979 and so was not collectible from the proceeds of the June 11, 1981 sale. It accordingly ruled in the Bank’s favor, paving the way for an appeal by the City of Baltimore urging that its power to collect its taxes could not thus be destroyed.
 
 [2]
 

 I
 

 One may admire the beautiful simplicity of the Bank’s position. The secured lien status of the mortgage came into being prior to the filing of the bankruptcy petition. The lien under Maryland law of the City and the State for 1980-81 taxes imposed on the real property which was the mortgage security only arose later, on July 1, 1980,
 
 [3]
 
 after the bankruptcy petition had been filed, according to Md.Ann.Code art. 81 § 70. The post-petition lien under Article 81 § 70 was “not perfected or enforceable on the date of the filing of the petition .. .,” and so could be avoided pursuant to 11 U.S.C. § 545.
 
 [4]
 
 Q.E.D., the mortgagee need contribute none of the foreclosure proceeds to satisfaction of the bill for 1980-81 real estate taxes.
 

 It all sounds logical as far as it goes. However, it entirely overlooks a matter of controlling importance. The avoidance powers of a trustee in bankruptcy are subject to the provisions of § 546(b) of the Bankruptcy Code. Under 11 U.S.C. § 546(b),
 

 [t]he rights and powers of the trustee under section . .. 545 [avoidance powers] ... are subject to any generally applicable law that permits perfection of an
 
 interest in property
 
 to be effective against an entity that acquires rights in such property before the date of such perfection.
 

 (emphasis supplied). As the leading treatise in the field has remarked, the import of § 546(b) is simple:
 

 [T]he intervention of a petition .. . should not cut off an interest holder’s opportunity to perfect where the interest holder could have perfected against an entity subsequently acquiring rights in the property if bankruptcy had not intervened.
 

 4 L. King, M. Cook, R. D’Agostino & K. Klee,
 
 Collier on Bankruptcy,
 
 ¶ 546.03[2], at 546-8 (15th Ed.1988).
 

 Not insignificantly, § 546(b) speaks of an “interest in property,” and does not limit its
 
 *1142
 
 scope to “liens,” whether so defined by federal or state law. Accordingly, we must consider just what interest the State of Maryland, and the City of Baltimore, held in the real estate here before the petition in bankruptcy was filed, as well as the effect of that interest upon a hypothetical purchaser who might have acquired the real property before real estate taxes were due and payable, that is, before the State’s interest was fully perfected and enforceable by virtue of a statutory lien.
 

 The starting point is Article 81 § 202(b) of the Maryland Annotated Code.
 
 [5]
 
 There, speaking in terms of preferences and not in terms of liens,
 
 [6]
 
 the Maryland Legislature has laid down that, upon the sale of property by a trustee,
 
 [7]
 
 the proceeds must be applied in satisfaction of any taxes due and payable by a corporate owner at the time distribution is made. That is so even if: (a) at the time of foreclosure, or (b) at the time of sale, the taxes had not yet become due and payable.
 
 [8]
 
 It suffices if the taxes had become due and payable before the party conducting the sale got around to distributing the proceeds.
 
 [9]
 

 And then, of course, there is the familiar proposition that a purchaser of real property cannot avoid the consequences of a property tax lien on the purchased realty where the lien represents taxes accrued before the date of sale. Md.Code Ann. art. 81 § 70. Indeed, when that proposition is taken in conjunction with the operation of Article 81 § 202(b), the full scope of the State’s interest in real property is revealed. The State has retained the right to require first application of the proceeds from the sale of the property, to taxes due and payable by the time of distribution, a right that is immediately perfected, if not enforceable until the sale actually occurs, at the very moment an interest in the real estate — such as the Bank’s mortgage, or a
 
 bona fide
 
 purchaser’s fee simple holding — arises. The interest, by force of the generally applicable law of Maryland, is ever-present, and has been a recognized attribute of the State’s property interest since a time well before 1978 when the deeds of trust effecting the security interest of the Bank came into being.
 
 [10]
 

 
 *1143
 
 Even if, for argument’s sake, we were to accept that the State’s interest in 1980-81 taxes was not “perfected” until July 1, 1980, nevertheless, the avoidance power under 11 U.S.C. § 545 is not here exercisable by the trustee in bankruptcy. Subsequent perfection of the interest must be permitted pursuant to § 546(b). As indicated in note 10,
 
 supra,
 
 it appears most probable that the generally applicable law of Maryland establishes that no entity acquiring rights in real property in Maryland can prevent the subsequent perfection of the State’s interest to secure payment of its real property taxes. On the date the 1980-81 taxes became due and payable, a lien of paramount superiority arose. It insures the desirable objective of effective, orderly, and fair taxation. Furthermore, in the present case we need not go that far inasmuch as the property has been the subject of a recent ministerial sale whose proceeds have yet to be distributed. Consequently, there is a preference of payment equivalent to a superior lien perfected against those proceeds. Md.Code Ann. art. 81 § 202(b).
 

 Congress in enacting § 546(b) perceived that the mere intervention of a petition in bankruptcy should not be permitted to defeat what would otherwise be a valid security interest in property. If that interest awaits perfection, and if the generally applicable state law permits that perfection to be good against an intervening purchaser, then the trustee should stand in no better shoes than such an intervening purchaser.
 
 [11]
 

 We conclude, then, that the district court was in error when it held that the trustee in bankruptcy could avoid the imposition of the City’s real property tax lien for the year 1980-81. Imposition of that tax lien, under Article 81 § 70, was only the last — not the first — step required to perfect the State’s long-standing interest in the real property in question, and a step which, under Maryland law, no entity could pre
 
 *1144
 
 vent. The City was entitled to that perfection under § 546(b) of the Bankruptcy Code when July 1, 1980 came around, and, thus, entitled to the superiority which the then-arising lien afforded.
 

 II
 

 What we do not decide merits mention. First, and foremost, we are presented with no question of whether a lien for federal taxes would take precedence over a tax subsequently becoming due and payable as that terminology is used in Article 81 § 202(b). Second, Maryland law recognizes the notice difficulties for purchasers or mortgagees in the summary creation of liens for taxes (other than real estate taxes applying to property which cannot move and had to be in position and automatically subject each and every year to taxation).
 
 [12]
 
 Where movable personalty is involved (Md. Ann.Code art. 81 § 70), where income must be earned (Md.Ann.Code art. 81 § 322(3)),
 
 [13]
 
 or a transfer must occur before a sales or use tax can apply (Md.Ann.Code art. 81 §§ 342, 393(b)), recordation of the particular tax is a pre-condition for the generation of a lien. As to all those taxes, arguments might be made that perfection of the State’s security interests for taxation purposes might not be effective against a
 
 bona fide
 
 purchaser and, hence, that the trustee might avoid the asserted lien without running afoul of § 546(b).
 
 [14]
 

 Having reached a decision favoring the position of Baltimore City, we could perhaps rest there. However, another approach urged by the City which would lead to the same result should not be ignored. The City asserts that the 1980-81 real estate taxes were necessary expenses which would benefit the Bank, as mortgagee, by protecting the collateral.
 
 [15]
 

 United States v. Wasserman,
 
 257 F.2d 491 (1st Cir.1958), appears to say just that in similar circumstances. However,
 
 Wasserman
 
 is incomplete authority inasmuch as it primarily involved a competition for priority between claims of the Federal Government and claims for City real estate taxes which became due only after commencement of the bankruptcy proceedings. There the mortgagees did not themselves appeal the decision of the district court that the post-petition real estate taxes were expenses properly recovered from the property before dis
 
 *1145
 
 tribution of any proceeds to the mortgagees. Furthermore, the opinion is somewhat weakened for it appears to engage in the practice of proving a proposition by assuming the answer:
 

 Certainly there is no question that the payment of the 1957 taxes was to the benefit of the mortgagees of the Pearl Street property in that it preserved the value of their security from diminution by reason of unpaid Boston taxes, as their mortgages clearly were inferior to the taxes assessed by the City of Boston even though such taxes were assessed subsequent to the recording of the mortgages.
 

 257 F.2d at 494 (footnote omitted). Nevertheless, independently of that questionable route to decision, the opinion makes a convincing case for the proposition that the taxes came ahead of the mortgage. Maryland National Bank seeks to dissipate the force of the
 
 Wasserman
 
 case by pointing out that the bankrupt estate there paid the taxes, apparently having assumed control of the mortgaged premises. In the present case, it is emphasized by the Bank that, since “the proceeds of sale were insufficient to satisfy the claims of secured creditors, it follows that the debtor has no interest in the proceeds.” The argument continues: “Consequently, none of the proceeds of this sale constitute property of the estate, and these proceeds are not available to pay administrative expense creditors.”
 

 That argument we find flawed. Moreover, if anything it helps buttress the City’s position. It is flawed since, until a time well beyond July 1, 1980, i.e., well after the 1980-81 taxes had become due and payable, the proceeding retained its character as a reorganization with the debtor in possession. Efforts to continue the business obviously were designed to foster the well-being,
 
 inter alia,
 
 of such a secured creditor as the Maryland National Bank. Had a reorganization eventuated, it stood to recover perhaps substantially more than $2,500,000 on an obligation of $6,000,000. While in the end the effort did not succeed, the Bank might well have come away with its loan of $6,000,000 fully satisfied, or less impaired than in the end proved to be the case.
 

 Furthermore, in other respects, we do not speak solely of a general benefit which all members of society derive from the activities of a state government funded from taxes, real property taxes in particular. More practically, the mortgaged premises were protected from vandalism by police paid by Baltimore City. The access to the premises by potential buyers at any foreclosure sale which might have to take place was facilitated by the maintenance of streets and roads. The application of City taxes to insure ready improved access could be expected to enhance marketability if a foreclosure sale became inevitable.
 

 Beyond that, the Bank’s acknowledgment that the debtor had no interest in the proceeds reveals that, from the time of the February 23, 1981, lifting of the stay, as a practical matter the equity of redemption was recognized as worthless. The property was permitted to revert to pre-bankruptcy status. In that pre-bankruptcy status, the mortgagee continued to be subject to the obligation to meet taxes due and payable at the time of distribution of the proceeds from any future foreclosure sale. That seems to make much sense and comport with the purposes of the Bankruptcy Reform Act. That act is designed to assuage as much as possible the pains of a secured creditor when its debtor goes bankrupt, to prevent the creditor from being worse off.
 
 [16]
 
 It is not however a bankruptcy objective to make a secured creditor better off than it would have been had there been no bankruptcy at all.
 
 [17]
 

 
 *1146
 
 A contrary result would have other serious inadequacies. It would certainly be highly inconsistent, if not irregular. All real estate taxes on the mortgaged premises due and payable for 1979-80 and prior years admittedly had first to be paid from the proceeds of the foreclosure sale. All taxes becoming due and payable after the foreclosure sale had taken place, i.e., for the tax year 1981-82, 1982-83, etc., would be collectible from the purchaser, or, if he failed to meet the obligation, from the proceeds of a tax sale. No one supposes that the bankruptcy trustee would' enjoy the power to avoid such tax liabilities into the remote future (e.g., 1987-88, 2000-01), although to do so would certainly enhance considerably the value of the asset sold and consequently benefit the debtor’s estate. It would ascribe to Congress considerable capriciousness to hold that it intended a contradictory result for that one intermediate year, 1980-81, and that one year only. It should require a very explicit Congressional expression indeed to explain why the State and its political subdivision should be able to continue to levy and collect, with superiority vis-a-vis the mortgagee, the annual impositions of
 
 ad valorem
 
 real property taxes both before and after the bankruptcy, but not for the very fleeting period between filing of the petition for reorganization and the sale of the property. It makes even less sense when one stops to appreciate that any taxes which, as a consequence, would go uncollected redound to the benefit not of the bankrupt or the unsecured creditors of the debtor’s estate, but solely to the benefit of the mortgagee.
 

 That secured creditor would be reaping a pure windfall. The obligation of the mortgagee to pay the taxes, even those which mature only after foreclosure, but before distribution of the proceeds, was an established, recognized duty before the mortgage loan was ever made. The mortgagee realized that it would have to meet such taxes if the need to foreclose should ever arise. Consequently, if, as a consequence of bankruptcy of the borrower, the real estate taxes could be avoided, pure manna from heaven in the form of an unanticipated and unmerited benefit would arise in the mortgagee’s favor, and no Congressional objective would be served.
 

 Accordingly, the judgment of the district court in favor of Maryland National Bank is reversed and the case remanded for further proceedings not inconsistent with this opinion.
 

 REVERSED AND REMANDED.
 

 [1]
 

 . Maryland National Bank has aided in the focusing of the issue which here confronts us by agreeing that: (a) “unless voided in Bankruptcy, the validity of a lien is determined by state law”; (b) “under Maryland law the City’s lien [for 1980-81 real estate taxes] would be superior to the Bank’s [mortgage] lien”; and (c) “that water rents and sewer charges are treated the same as taxes under Maryland law.” As to the preferred position under Maryland law of the 1980-81 taxes see
 
 Edmondson v. Chesapeake Clamchip Corp.,
 
 350 F.Supp. 1236, 1238 (D.Md.1972) (Harvey, J.) (“Under Maryland law, state and local real estate taxes are a first lien on real estate and would have priority over other liens on the property in favor of private parties, whether prior or subsequent.”).
 
 Cf. Vermont Federal Savings & Loan Ass’n v. Wicomico County, Maryland,
 
 263 Md. 178, 283 A.2d 384 (1971) (county held to have right to priority of payment of personal property taxes from proceeds of mortgage sale of realty; lien representing personal property taxes post-dated mortgage).
 

 Edmondson
 
 also refers to the accepted proposition that “under federal law, a prior lien in favor of the United States takes precedence over a subsequent lien for state and local taxes.” 350 F.Supp. at 1238. In the present case, however, no federal lien, prior or subsequent, is involved. The competition is exclusively between a State of Maryland claim and the claim of a private party.
 

 We assume that the Maryland National Bank does not contest the lumping in of fire protection fees (amounting to $30.62) with water rents and sewer charges for present purposes.
 

 [2]
 

 . It would appear that the estate of Maryland Glass Corporation, the bankrupt debtor, will not suffice to meet those taxes. Accordingly, the effect of the judgment in the district court, if affirmed, is to prevent the City’s ever collecting the 1980-81 real estate taxes.
 

 [3]
 

 . Md.Ann.Code art. 81 § 70: “... all ... taxes on real estate shall be until paid liens ... from the date they became or become payable.” Md.Ann.Code art. 81 § 48(e): “Ordinary city taxes ... are ... due and payable ... as of the first day of July for any year subsequent to 1968.”
 

 [4]
 

 .The logical path followed by the Bank is discreetly silent as to whether a lien for 1980-81 taxes would have been perfectible or enforceable against a
 
 bona fide
 
 purchaser who bought the property on October 31, 1979. The proposition that it would not, as we shall demonstrate, simply does not va
 
 sans dire.
 

 [5]
 

 . Md.Ann.Code art. 81 § 202(b):
 

 Whenever a sale of either real or personal property of a corporation, from which State taxes, are due and payable, shall be made by any sheriff, constable, trustee, receiver or other ministerial officer, under judicial process or otherwise, all sums due and in arrears for State taxes from the corporation whose property is sold shall be first paid and satisfied, after the necessary expenses incident to the sale; and the officer or person selling said property shall pay the same to the person whose duty it is to collect or receive said taxes, under the laws of this State.
 

 [6]
 

 . The right to have sales proceeds first applied to payment of taxes, while not technically a lien,
 
 Wethered v. Alban Tractor Co.,
 
 224 Md. 408, 417, 168 A.2d 358, 363 (1961),
 
 cert. denied,
 
 368 U.S. 830, 82 S.Ct. 53, 7 L.Ed.2d 33 (1961), is a quasi-lien,
 
 Degner v. Brown,
 
 74 Md. 144, 21 A. 697 (1891).
 

 [7]
 

 . The foreclosure sale made on the Bank’s behalf was a sale by a trustee for the purposes of Article 81 § 202(b).
 
 Vermont Federal Savings
 
 &
 
 Loan Ass’n, supra,
 
 263 Md. at 184, 283 A.2d at 388.
 

 [8]
 

 .
 
 Vermont Federal Savings & Loan Ass’n, supra,
 
 263 Md. at 186-87, 283 A.2d at 389.
 

 [9]
 

 . We deal in the case
 
 sub judice
 
 only with taxes levied on the property subject to the mortgage. We have no occasion to consider the interplay with bankruptcy law of the provision in § 202(b) that other taxes imposed on the owner of real estate, due and payable at the time of distribution, Maryland personal property taxes in particular, also are to be accorded a preference placing them ahead of the mortgagee’s claim.
 

 [10]
 

 . Since a sale by a trustee fitting Article 81 § 202(b) occurred, with distribution of the proceeds taking place, well after the date, July 1, 1980, when the taxes became due and payable, we need not determine the validity of the further distinct possibility that the mere passage of time, specifically passage post July 1, 1980, of itself, without more, led to a perfection of the State’s interest to collect 1980-81 taxes from the real estate as against an October 31, 1979
 
 bona fide
 
 purchaser. That one out of many annual tax collection rights owned by the State and the City was inevitable and fully foreseeable not only on October 31, 1979 when we assume there was a purchase by a hypothetical
 
 bona fide
 
 purchaser, but also on October 20, 1978 when the Bank’s mortgage arose. The Maryland law, it can be convincingly urged, permits perfection of that right to collect
 
 *1143
 
 future real estate taxes from the real property itself against an entity (either the mortgagee, or
 
 bona fide
 
 purchaser, or both) which has acquired rights in the property before the date of perfection, i.e. July 1, 1980. One regularly buys real estate knowing that purchase entails an obligation to meet future real estate taxes when they become due and payable, and that perfection of the right to collect automatically occurs on the first day of July in each and every year.
 

 In other words, there could not be a
 
 bona fide
 
 purchaser on October 31, 1979 who, having taken title on that date, could, because, or even though, he was a good faith acquirer escape the taxes which only matured eight months later, on July 1, 1980.
 

 If he held on to the property beyond July 1, 1980, he would have to pay the taxes. If he disposed of the real estate before July 1, 1980, he would escape the taxes only in the most technical, insubstantial of senses. For any taker from him, aware of the upcoming liability for 1980-81 taxes would factor that consideration into the equation in determining what he would be willing to pay.
 

 [11]
 

 .
 
 See, e.g., In re Cummins, 656
 
 F.2d 1262 (9th Cir.1981). In
 
 In re Cummins,
 
 the California taxing authorities argued that they could perfect their lien on
 
 personal
 
 property by serving notice upon the trustee in bankruptcy. At issue was the predecessor of § 546(b), former 11 U.S.C. § 107(c)(1)(B), which, similarly to § 546(b), allowed perfection against the trustee where perfection would be valid against a
 
 bona fide
 
 purchaser. The court never questioned the applicability of the section to a tax lien, but went on to hold for the trustee “[b]ecause the lien could
 
 never
 
 be good against a [bona fide purchaser].”
 
 In re Cummins,
 
 656 F.2d at 1266. Here, by contrast, we are presented with an interest
 
 (real estate
 
 taxes) in property which
 
 always will
 
 be good against a
 
 bona fide
 
 purchaser.
 

 Potato Service, Inc. v. Manufacturers Hanover Trust Co. (In re American Kitchen Foods, Inc.),
 
 2 Bankr.Ct.Dec. 1146 (Bankr.D.Me.1976), dealt with real property taxes imposed by the State of North Dakota. The court held, under the predecessor of § 545, that a post-petition statutory lien for such taxes was invalid against the trustee, adopting a rationale identical to the one proffered by the Bank here. That line of reasoning, however, fails to take into account the State’s property interest in real estate for the purposes of collecting taxes in the future
 
 whenever
 
 such taxes become due and payable. Section 545 of the Code, as well as its predecessor, seemingly takes no cognizance of that interest, as it speaks strictly of “liens,” and both the court in
 
 Potato Service
 
 and the Bank here limit their analysis to the confines of § 545. But § 546(b) of the Code, which does not limit its scope to “liens,” indeed does recognize that interests in property which may be perfected against an entity in the chain of hypothetical
 
 bona fide
 
 purchasers may also be perfected against the trustee in bankruptcy.
 

 [12]
 

 . We deal solely with such real estate taxes, as to which no notice difficulties attach.
 

 [13]
 

 . Md.Ann.Code art. 81 § 322(3):
 

 From the time such lien is filed ... such lien shall be superior to that of any subsequent mortgages.... The lien of any mortgagee ... perfected ... prior to the filing of notice of the State’s lien ... shall be preferred to the lien of the State.
 

 [14]
 

 .
 
 See In re New England Carpet Co.,
 
 26 B.R. 934 (Bkrtcy.D.Vt.1983). In the
 
 New England Carpet
 
 case, the City of Winooski attempted to assert a post-petition lien for personal property taxes. The court concluded that § 546(b) did not prevent the trustee from avoiding the lien, reasoning that the post-petition creation of the statutory lien was not the “perfection” of a pre-existing interest but, instead, the creation of an interest for the first time. Significant to the court there was the fact that § 362(a)(4) of the Code prohibits “any act to create, perfect, or enforce any lien,” and that § 362(b)(3) only exempts from the automatic stay “any-act to perfect an interest.”
 
 See also Geiger v. City of Southfield (In re Continental Credit Corp.),
 
 1 B.R. 680 (Bkrtcy.N.D.Ill.1979) (personal property tax liens held avoidable).
 

 The mobility of personal property serves as the logical premise of the kind of argument embraced in
 
 New England Carpet
 
 and, at least implicitly, in
 
 Geiger.
 
 Because there is no assurance that the taxing authorities will, indeed, have the power to tax a given item of personal property in any given year, it is difficult to maintain the proposition that the City or State possessed a pre-existing interest in the property that only remained to be perfected after the petition in bankruptcy was filed.
 

 Where, however, immovable and ever-present real estate is at issue, the State’s interest in the property for the purposes of real estate taxation is a very real and not-to-be-doubted interest that pre-exists a petition in bankruptcy. The imposition of the lien representing the taxes due for any given tax year is but the manifestation, or perfection, of that underlying interest.
 

 [15]
 

 .11 U.S.C. § 506(c):
 

 The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.
 

 [16]
 

 . “The objective ... is to insure that collateral or its proceeds is returned to the proper record creditor....” H.Rep. No. 595, 95th Cong., 1st Sess. 382 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6338,
 
 reprinted in
 
 L. King, R. Levin & K. Klee,
 
 Collier on Bankruptcy
 
 Appendix 2 (15th ed. 1983).
 

 [17]
 

 . A secured claim exists only to the extent of the creditor’s interest in the estate’s interest in pledged property. 11 U.S.C. § 506(a).
 

 This rule, commonly known as the bankruptcy rule, is designed to preclude any unwarranted advantage from accruing to the secured creditor.
 

 
 *1146
 

 United States National Bank v. Chase National Bank,
 
 331 U.S. 28, 34, 67 S.Ct. 1041, 1044-1045, 91 L.Ed. 1320 (1947).